IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORRAYNE HARTNETT,<br><br>    Plaintiff<br><br>v.<br><br>JACKSON NATIONAL LIFE<br>INSURANCE COMPANY,<br><br>    Defendant | )<br>)<br>)<br>)<br>)<br>)  No.<br>)<br>)  **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>) |

# COMPLAINT

Now comes the Plaintiff, LORRAYNE HARTNETT, by her attorneys, MARK D. DE BOFSKY and DE BOFSKY LAW, LTD., and complaining against the Defendant, JACKSON NATIONAL LIFE INSURANCE COMPANY, she states:

### *Jurisdiction*

1. Jurisdiction of this Court is based on diversity of citizenship, 28 U.S.C. § 1332(a) since this matter is brought between citizens of different states and the amount in controversy is in excess of $75,000 exclusive of interest and costs.

2. Venue is proper in the Northern District of Illinois pursuant to 29 U.S.C. § 1391 because the Defendant does business in this District and the transactions, events and occurrences relevant to this matter took place within this District.

### *Nature of the Action*

3. This matter involves a claimed breach of a contract of long-term care insurance owned by the Plaintiff. Plaintiff, Lorrayne Hartnett, alleges that the Defendant, Jackson National Life Insurance Company ("Jackson") breached its contract to pay her indemnity when she incurred a covered loss under the policy. A true and accurate copy of the relevant long term care insurance

policy (a/k/a "Nursing Care Policy") ("Policy") is attached hereto and by that reference incorporated herein as Exhibit "A."

## *The Parties*

4. Lorrayne Hartnett ("Hartnett"), who is currently 95 years old and will soon turn 96, lives in Northbrook, Illinois and is a citizen of the State of Illinois.

5. Jackson National Life Insurance Company ("Jackson") is incorporated in the State of New York and has its principal place of business in the State of Michigan and is therefore a citizen of the States of New York and Michigan.

## *Facts*

6. For and in consideration of substantial premiums paid annually from November 28, 1998 to the present, Allied Life Insurance Company issued a policy of long-term care insurance to Hartnett and to her late husband William F. Hartnett, which has been in full force and effect from November 28, 1998 to the present. The Policy was issued in the State of Illinois, and by its own terms is required to conform to the laws of that state. Through a series of mergers, Jackson became the insurer of Hartnett's policy and insured Plaintiff for long-term care insurance at all times relevant hereto.

7. Based on included cost-of-living increases in the amount of indemnity payable under the policy since its issuance, by 2021, the Policy provided benefits that would reimburse eligible expenses of between $9,000 - $11,000 per month commencing as of the date a claim is incurred without any elimination period and continuing for the lifetime of the insured.

8. The Policy provided benefits for nursing care, for assisted living, or for an alternative plan of care to provide in-home care for an insured who met the Policy definition of being a "Chronically Ill Individual"; i.e.,

> Any individual who has been certified within the previous 12 months by a Licensed Health Care Provider as:
>
> 1. Being unable to perform, without substantial assistance from another individual, at least two Activities of Daily Living for a period of at least 90 days due to loss of functional capacity, or
> 2. Requiring substantial supervision to protect such individual from threats to health and safety due to severe Cognitive Impairment.

9. The Activities of Daily Living referenced above which are listed in the Policy include: Bathing, Continence, Dressing, Eating, Toileting, and Transferring.

10. On May 3, 2021, in the midst of the COVID-19 pandemic, Hartnett fell and broke her hip, which required her to be hospitalized for emergency surgery.

11. Following Hartnett's hospitalization, when she was ready to be discharged, her treating physician, Philip H. Sheridan, Jr., M.D., directed, due to the risk of infection from COVID-19, that in place of skilled nursing and rehabilitation, along with other follow-up care that would be needed after the surgery due to Hartnett's inability to perform basic activities of living without substantial assistance, that she be discharged to her home with arrangements made for her to receive necessary care due to the hip surgery, along with several co-morbidities including congestive heart failure, pulmonary fibrosis with chronic hypoxemic respiratory failure, hypertension, severe spinal stenosis, hearing loss, and sustained weakness and loss of range of motion in the left shoulder due to a major rotator cuff tear. Dr. Sheridan further documented in a letter to Jackson dated November 4, 2021 (copy attached at Exhibit "B"), which Jackson requested him to send so that it could consider providing benefits under an Alternative Plan of Care, that "Hartnett required assistance with basic life functions such as bathing, eating, dressing, getting to and from the toilet, cooking, and operating appliances."

12. Dr. Sheridan added that he prescribed a minimum of assistive care for Hartnett of 16 hours per day, 7 days a week, and advised Jackson that providing such care in Hartnett's home

was also significantly less expensive than the cost of care in a skilled nursing facility and an assisted living facility.

13. Shortly before writing the aforementioned letter to Jackson, Dr. Sheridan documented that he had recently reevaluated Hartnett's care needs and determined that such needs remain ongoing. Dr. Sheridan further maintained that the care should be provided in Hartnett's home for a variety of reasons, including "COVID-19 concerns."

14. According to an article published in the Journal of the American Geriatric Society (Coe and Van Houtven, "Living Arrangements of Older Adults and COVID-19 Risk: It is Not Just Nursing Homes," J. Am. Geriatr. Soc. 2020 July, 68(7), 1398-1399 (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7267374/), the first significant coronavirus outbreak in the U.S. occurred in a nursing home and that both nursing homes and assisted living facilities pose a high risk of transmission of the coronavirus. In addition, the Centers for Disease Control advised that older adults and people with underlying health conditions such as the heart and lung conditions from which Hartnett suffers place her at high risk of severe illness or death from COVID-19. See, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#:~:text=Chronic%20obstructive%20pulmonary%20disease%20(COPD,blood%20pressure%20in%20the%20lungs)

15. The United States has also been under a National Emergency Declaration since March 2020 due to the COVID-19 pandemic. Although the Declaration did not directly affect the Policy, it did impact Medicare, Medicaid, and private health insurance to permit individuals to remain sheltered in their homes in order to receive medical care. See, e.g.,

https://www.kff.org/coronavirus-covid-19/issue-brief/what-happens-when-covid-19-emergency-declarations-end-implications-for-coverage-costs-and-access/.

16. Based on Hartnett's need for care covered by the Policy and Dr. Sheridan's plan of care, Hartnett submitted a timely and well-documented claim for benefits under the Policy to Jackson.

17. Despite the rationale for home care provided by Dr. Sheridan, and even though Jackson never denied that Hartnett was a Chronically Ill Individual, Jackson denied Hartnett's claim for benefits based on a false rationale that her policy did not cover the services she was receiving.

18. Although the Policy covers nursing care and assisted living, and includes coverage under an "Alternative Plan of Care" that would provide for the in-home services provided to Hartnett, Jackson maintained that such coverage would only be available to Hartnett if she received such services following confinement in a Nursing Care Facility.

19. Jackson's assertion that the Alternative Plan of Care was inapplicable because Hartnett was not initially in a facility is contrary to 50 Ill. Admin. Code § 2012.70(a), which provides in relevant part:

> A long-term care insurance policy or certificate may nit, if it provides benefits for home health care or community care services, limit or exclude benefits: (2) By requiring that the insured/claimant first or simultaneously receive nursing and/or therapeutic services in a home or community or institutional setting before home health care services are covered.

According to 50 Ill. Admin. Code § 2012.20, the foregoing regulation is applicable to policies delivered or issued after June 15, 1990. The Illinois Administrative Code further states that the purpose of the foregoing regulations was to implement Article XIXA of the Illinois Insurance Code (215 ILCS 5/351A-1) et seq.).

20. Hartnett challenged Jackson's denial and asserted the exigency of the National Emergency; however, Jackson ignored that issue and maintained the terms of Hartnett's policy precluded coverage even though the National Emergency Declaration mandated that insurers permit extracontractual coverage such as telehealth visits with doctors. Nor was any consideration given to Dr. Sheridan's statements as to the lower cost of in-home services, which would have resulted in a lower rate of reimbursement by Jackson for the services Hartnett received and consequent cost savings.

21. As a direct and proximate result of the foregoing, including the National Emergency, Hartnett has incurred expenses of over $150,000 that should have been reimbursed by Jackson in accordance with the Alternate Plan of Care coverage in the Policy.

22. Jackson's reliance on policy terms that are inconsistent with the requirements of Illinois law was in direct violation of 215 ILCS 5/154.6(a), which makes it unlawful to knowingly misrepresent "to claimants and insureds relevant facts or policy provisions relating to coverages at issue."

23. Jackson's disregard of Illinois' legal requirements, which has forced Hartnett to file suit in order to enforce her rights under the terms of the Policy for which she paid substantial premiums for more than 20 years at the time her claim was incurred is unreasonable and vexatious conduct which is remediable pursuant to 215 ILCS 5/155.

WHEREFORE, Plaintiff prays that the Court enter judgment in favor of Plaintiff and against the Defendant and award Plaintiff the following relief:

A. All benefits due in accordance with the Policy schedule;

B. Prejudgment interest on all benefits in arrears;

C. The maximum penalty of $60,000 provided for by 215 ILCS 5/155;

  D.  Attorneys' fees as provided for by 215 ILCS 5/155;

  E.  Plaintiff's costs of suit; and

  F.  Any and all other relief to which she may be entitled.

### *Jury Demand*

Plaintiff demands trial by jury.


              <u>/s/ Mark D. DeBofsky</u>
              Attorney for Plaintiff

Mark D. DeBofsky
DeBofsky Law, Ltd.
150 N. Wacker Dr., Suite 1925
Chicago, Illinois 60606
(312) 561-4040
mdebofsky@debofsky.com